## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **JAMES SMITH,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| | ) | **Civil Action No. 3:15-CV-02964-BH** |
| **v.** | ) | |
| | ) | |
| **CAROLYN COLVIN,** | ) | |
| **COMMISSIONER OF THE SOCIAL** | ) | |
| **SECURITY ADMINISTRATION,** | ) | **Consent** |

## MEMORANDUM OPINION AND ORDER

Pursuant to the consent of the parties and the order of reassignment dated November 23, 2015 (docs. 13, 15), this case has been transferred for the conduct of all further proceedings and the entry of judgment.  Before the Court are *Appellant's Appeal Brief*, filed March 29, 2016 (doc. 25), and *Defendant's Brief*, filed April 28, 2016 (doc. 26).  Based on the relevant findings, evidence, and applicable law, the Commissioner's decision is **REVERSED**, and the case is **REMANDED** for further administrative proceedings.

## I. BACKGROUND[1]

### A.   Procedural History

James Smith (Plaintiff) seeks judicial review of a final decision by the Commissioner of Social Security (Commissioner) denying his claim for supplemental security income (SSI) under Title XVI of the Social Security Act.  (doc. 25.)  On January 20, 2012, Plaintiff applied for SSI, alleging disability beginning on January 14, 2012, due to a severe traumatic brain injury and major depressive disorder.  (R. at 10, 12, 56.)  His application was initially denied and upon

---

[1]  The background information comes from the transcript of the administrative proceedings, which is designated as "R."

reconsideration. (R. at 10, 58-69.) Plaintiff requested a hearing before an Administrative Law Judge (ALJ), and appeared to testify at a hearing on January 9, 2014. (R. at 34-45.) On February 25, 2014, the ALJ issued his decision finding Plaintiff not disabled. (R. at 10-21.) Plaintiff requested review of the ALJ's decision, and the Appeals Council denied his request on June 18, 2015. (R. at 51.) He timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (doc. 1.)

**B.**   **Factual History**

   *1.*   *Age, Work Experience, & Education*

Plaintiff was born December 8, 1965, and was 49 years old at the time of the hearing before the ALJ. (R. at 19, 39.) He had a high school education and past relevant work as an operations manager for a metal recycling center. (R. at 19, 39.)

   *2.*   *Medical, Psychological and Psychiatric Evidence*

On January 14, 2012, Plaintiff was brought to the Medical Center of Plano after being involved in a motorcycle crash. (R. at 261.) He was diagnosed with traumatic brain injury and facial fractures. (R. at 222, 270.) Plaintiff had various procedures between January 14-19, 2012, including a Camino blot to relieve pressure. (R. at 222-23.) He was discharged on February 3, 2012. (R. at 222.)

On February 15, 2012, Plaintiff followed up with Acute Surgical Care Specialist, LLP regarding his recent surgeries at Medical Center of Plano. (R. at 218-19.) He reported headaches and dizziness when rising to stand, but overall, he felt better and that his energy had improved since his release from the hospital. (R. at 219.)

On February 21, 2012, Plaintiff was seen by Brent C. Morgan, M.D., who noted an epidural hematoma on a CT scan and needed treatment for increased intracranial pressure. (R. at 403-04.)

The physical examination revealed that Plaintiff's consciousness was normal, that he was "[a]lert and oriented X 3," and had "[g]rossly normal intellect," intact memory and coordination, no sensory loss, and normal fine motor skill.  (*Id.*)  Dr. Morgan ordered a follow-up CT scan to verify that Plaintiff's intracranial hemorrhage was resolved, and if resolved, cleared him for driving.  (*Id.*)

Plaintiff met with Dr. Morgan on March 1, 2012 regarding his follow-up CT scan.  (R. at 401.)  His physical examination was the same as his postoperative visit on February 21, 2012.  (*See* R. at 401, 403.)  Dr. Morgan noted that the CT scan revealed some right frontal edema around the area of the contusion, but it continued to evolve in a normal manner.  (*Id.*)  No other intracranial lesions were identified.  (*Id.*)  Dr. Morgan noted that "[Plaintiff] has continued to see improvement" and that he was using less of his pain medication.  (*Id.*)  Dr. Morgan cleared Plaintiff to return to work at the beginning of the following week.  (*Id.*)

On March 27, 2012, Plaintiff met with Dr. Morgan for a CT follow up.  (R. at 399-400.) Plaintiff's wife reported to Dr. Morgan that she was concerned about Plaintiff's mental state, and that he was easily irritated and frustrated, had difficulty concentrating, lashed out at family, and seemed paranoid.  (R. at 399.)  Plaintiff reported headaches that occurred at the end of the day.  (*Id.*) Dr. Morgan noted that Plaintiff's level of consciousness was normal and that he was "[a]lert and oriented X 3."  (R. at 400.)  Dr. Morgan also noted that Plaintiff's CT scan did not reveal any new hemorrhages or evidence of a cerebrospinal fluid leak.  (*Id.*)  His examination did reveal a right chronic infarct, however.  (*Id.*)   Dr. Morgan further noted that Plaintiff's cognitive deficits were related to his head injury and recommended that he not work at this time.  (*Id.*)

On May 1, 2012, during a follow-up appointment, Dr. Morgan noted Plaintiff continued to have persistent headaches, intermittent dizziness, and nausea, but no vomiting.  (R. at 396.)  Plaintiff

reported that he had difficulty processing information and got frustrated easily, but was not able to start neurocognitive therapy due to financial issues.  (*Id.*)

On June 29, 2012, Dr. Morgan completed a mental status report for Plaintiff.  (R. at 416-18.) He had no history of mental illness, alcohol, or drug abuse.  (R. at 416).  Plaintiff was well-groomed, well-nourished, and exhibited appropriate behavior.  (*Id.*)  His voice and speech were clear and intact; he was alert and oriented to time, place, and person; and his memory was intact.  (R. at 416-18.)  His content of thought and thought process was appropriate; his attention and concentration were intact; and he had appropriate insight and judgment.  (R. at 17.)  Dr. Morgan noted that Plaintiff needed to see a psychologist for DSM-IV and that maximum improvement may take one year.  (R. at 418.)  He also reported that Plaintiff had difficulty concentrating and was easily irritated and frustrated in regard to his ability to relate to others, sustain work, and respond to change in work settings.  (*Id.*)

On July 6, 2012, Rodney Ryder, LPC[2] diagnosed Plaintiff with major depression disorder and generalized anxiety disorder.  (R. at 420-23.)

On July 6, 2012, Carol Starr, M.S.N. conducted a psychiatric evaluation of Plaintiff at Lakes Regional MHMR Center (Lakes Regional).  (R. at 424-28.)  She noted that Plaintiff exhibited signs of depression and confusion.  (R. at 424.)  His interview behavior was appropriate and he was oriented to time, place, person, and his current situation.  (R. at 426-27).  His recent memory was intact, and he demonstrated good judgment.  (*Id.*)  He expressed thoughts of worthlessness and ideas of guilt.  (R. at 427.)  Plaintiff had no delusions and his intellect was above normal.  (*Id.*)  Nurse Starr prescribed Citalopram for depression and Hydroxyzine for agitation.  (R. at 432.)

---

[2]  Licensed Professional Counselor

Linda Ludden, Ed.D., conducted a mental status exam of Plaintiff on July 25, 2012. (R. at 433-43.)   He appeared alert throughout the interview and was cooperative when answering questions.   (R. at 433.)   He engaged in tasks requiring minimal cognitive investment and those requiring more thought.   (*Id.*)   Dr. Ludden noted that Plaintiff was taking Lisinopril, Amlodopine BES, and Metoprotol.   (R. at 434.)   He was also prescribed Celexa (which he never took) and Xanax for agitation, but he reported it made him worse.   (R. at 433-34.)   Plaintiff indicated that he needed supervision, but he was capable of caring for his personal needs, completing chores, and preparing his own meals.   (R. at 434.)   He got along with others, but did not get along well with authority figures since his injury.   (*Id.*)   Dr. Ludden diagnosed Plaintiff with major depressive disorder.   (R. at 442.)   She further noted that counseling and recommended medication, which he was prescribed but had not taken, would have greatly helped with his depression and adjustment.   (*Id.*)

On September 6, 2012, Tina Ward, M.D., a state agency medical consultant, completed a case assessment form for Plaintiff.   (R. at 446.)   Dr. Ward identified Plaintiff's medically determinable impairment as traumatic brain injury, but noted that it was a non-severe impairment. (R. at 446.)

On September 6, 2012, Blaine Carr, Ph.D., a medical consultant, completed a psychiatric review and mental RFC assessment for Plaintiff.   (R. at 447-63.)   She identified his medically determinable impairments as traumatic brain injury and major depressive disorder.   (R. at 447-50.) Dr. Carr noted moderate limitations on some of Plaintiff's abilities, and assessed his functional capacity as follows:

> The claimant is maximally able to understand, remember, and carry out detailed but not complex instructions, make decisions, and attend and concentrate for extended periods.   Claimant can accept instructions and respond to changes in a routine work setting.

5

(R. at 461-63.)

On September 19, 2012, Plaintiff again met with Nurse Starr at Lakes Regional. (R. at 466-68.) Nurse Starr noted that Plaintiff's symptoms had worsened, and he expressed that he was agitated all the time and always on the verge of anger, his depression had not improved, and he could not handle anything new or unfamiliar. (R. at 467-68.) Nurse Starr stopped his use of Citalopram and Hydroxyzine, and prescribed Clonazepam and Carbamazepine. (*Id.*)

On December 19, 2012, Plaintiff met with Nurse Starr for a check-up. (R. at 507-10.) He claimed that he had panic attacks and was unable to drive because he became panicky. (*Id.*) He slept between 12 to 16 hours per day. (*Id.*) He also repeated himself. (*Id.*) Nurse Starr noted that his self-confidence was low, but that his thought process was logical and goal-directed. (*Id.*) She reduced Plaintiff's prescription for Tegretol. (*Id.*)

On January 7, 2013, Plaintiff met with Rae M. Gladden, LPC, for psychotherapy. (R. at 548.) She noted that Plaintiff and his wife were very active, but after the accident, they had difficulty being in crowds. (*Id.*) Plaintiff reported that he did not like to go out and was not social anymore. (*Id.*) He panicked sometimes if he was around a lot of people. (*Id.*) Ms. Gladden gave him handouts on cognitive behavioral health and ways to deal with anxiety. (*Id.*)

On January 8, 2013, J. Lawrence Muirhead, Ph.D., a clinical psychologist, conducted a psychological evaluation of Plaintiff. (R. at 484-87.) He noted that Plaintiff's thought processes were tangential, but when provided with a great deal of structure, he was able to remain topic-oriented without difficulty. (R. at 486.) Dr. Muirhead also noted that Plaintiff's thought process reflected good conceptual development and that he appeared to function intellectually within an average range. (*Id.*)

On January 15, 2013, Plaintiff again met with Ms. Gladden for psychotherapy.  (R. at 547.)
She diagnosed Plaintiff with post traumatic stress disorder, and gave him another handout.  (*Id.*)

On February 6, 2013, Thomas Geary, Ph.D., a medical consultant completed a psychiatric review and mental RFC assessment for Plaintiff.  (R. at 489-91.)  In his psychiatric review, he found a history of traumatic brain injury, major depressive disorder, generalized anxiety disorder partially in remission, and post traumatic stress disorder.  (R. at 494-98.)  He also found that Plaintiff was moderately limited in several areas, and assessed his functional capacity as follows:

> Claimant can understand, remember and carry out detailed but not complex instructions, make decisions, attend and concentrate for extended periods, interact with others and respond appropriately to changes in routine work setting.

(R. at 489-91.)  Dr. Geary noted that Plaintiff's mental limitations do "not wholly compromise the capacity to function independently, effectively and appropriately on a sustained basis."  (R. at 505.)  He also noted that although Plaintiff's alleged limitations are partially supported by the record, the "alleged severity and limiting effects from the impairments are not wholly supported."  (*Id.*)

On February 19, 2013, Plaintiff again met with Ms. Gladden.  (R. at 542.)  He told her about his inability to remember what he had for dinner the night before.  (*Id.*)

On February 27, 2013, Plaintiff met with Nurse Starr at Lakes Regional.  (R. at 524-34.)  He complained of "bad nightmares causing trouble sleeping."  (R. at 524.)  Plaintiff reported taking his medication consistently. (*Id.*)  Nurse Starr noted that he was oriented to person, place, time, and situation, and that his insight and judgment were fair.  (R. at 528, 530.)

On March 20, 2013, Y. Elizabeth Ogunnaike, NP, examined Plaintiff at the Greenville Community Health Center (Greenville).  (R. at 585-87.)  He had hypertension and symptoms of fatigue, but he was oriented to time, place, person, and situation, and demonstrated appropriate

mood.  (R. at 585.)  He was prescribed Lisinopril, Amlodipine, and Metoprolol, and instructed to continue to take one Carbamazepine tablet two times a day.  (R. at 587.)

Plaintiff met with Ms. Gladden five times for psychotherapy between March 27, 2013 and May 7, 2013.  (R. at 535, 540-41, 551-52.)  Limited progresses was reported in some sessions.  (*See id.*)  Ms. Gladden continued to encourage Plaintiff and provide him new techniques to address his mental issues.  (*Id.*)

On June 6, 2013, Nurse Starr examined Plaintiff at Lakes Regional.  (R. at 564-67.)  He was oriented to person, place, time, and situation, and knowledgeable of current events and simple geography.  (R. at 565.)  She also noted that his insight and judgment were fair.  (R. at 567.)  She examined him again on August 12, 2013, diagnosed him with a schizoaffective disorder, and recommended him for the In Shape Program. (R. at 573-583.)

On August 13, 2013, Nurse Ogunnaike examined Plaintiff at Greenville.  (R. 588-90.)  His hypertension was stable.  (R. at 588.)  Plaintiff was counseled on smoking cessation, diet, and physical activity, and instructed to stop smoking.  (R. at 589.)

### 3.    *Hearing Testimony*

On January 9, 2014, Plaintiff and a vocational expert (VE) testified at a hearing before the ALJ.  (R. at 28-50.)  Plaintiff was represented by an attorney.  (R. at 28.)

### a.    *Plaintiff's Testimony*

Plaintiff testified that he was born December 8, 1965.   (R. at 39.)  He was injured in a motorcycle accident that damaged his brain.  (R. at 34-35.)  He was in a coma for seven days and could not remember much of what happened the year of his accident.  (R. at 35.)

Before the accident, Plaintiff was an operations manager at a metal recycling center.  (R. at

39.)  He was responsible for eight or nine employees and managed payroll.  (*Id.*)  He could no longer

do this work because of his brain injury.  (*Id.*)  It affected his memory to the extent that he could not

remember what he had for dinner the previous night. (R. at 35.)  He could not follow instructions

and would wander off and not complete what he was told to do.  (R. at 36.)  He constantly

daydreamed and could not focus on one thing.  (*Id.*)  He would lose track or interest in what he was

doing.  (*Id.*)  If it was not for his wife, he would be in a shelter.  (R. at 37.)

Plaintiff testified he could no longer drive because it scared him.  (*Id.*)  He had a truck driver

license, which required him to take the CDL test.  (R. at 37-38.)  He felt that he no longer had the

ability to pass the CDL test.  (*Id.*)  He also testified that his brain injury had taken away his ability

to support his family.  (R. at 40.)  He did not take care of himself and relied on his wife to make sure

he bathed. (*Id.*)  He felt depressed at the fact that he could not even remember to brush his own teeth.

(*Id.*)  He was taking his medication as instructed and was functioning while on the medication.  (R.

at 40-41.)  In his opinion, he could not be given simple instructions, remember them for more than

30 minutes, and "be able to go do something."  (R. at 41.)  He attended cognitive therapy to work

on his memory, temper issues, and anxiety.  (R. at 43.)  The doctor taught him techniques to use to

keep him from getting anxious and stuttering, but he could not  keep up with what the doctor was

telling him.  (*Id.*)

### b.     VE's Testimony

The ALJ asked the VE to consider a hypothetical person of the same age, education, work

background, and profile as Plaintiff.  (R. at 45.)  The hypothetical person had the abilities to

understand, remember, and carry out simple instructions.  (*Id.*)  His judgment was commensurate

with the functions of an unskilled worker, including the ability to make simple work-related

decisions, deal with changes in a routine work setting, and respond appropriately to supervision, coworkers, and usual work situations. (*Id.*) He asked the VE also to assume that the hypothetical person must have work that does not require joint decision-making or teamwork. (*Id.*) Contact with the general public must be no more than occasional and must not require the hypothetical person to direct or receive directions from the general public, and interaction on the job with other people must be of only superficial in nature. (R. 45-46.)   The work could not require individual initiative, and that the hypothetical person was restricted to routine, solitary, repetitive work that does not require close oversight by a supervisor. (R. at 46.) The hypothetical person must avoid exposure to unguarded hazards, unprotected heights, moving machinery, and open flames, and he must have work that does not require more than occasional exposure to extremes of temperature, loud noises, or intrusive distractions. (*Id.*) The ALJ also stated that the hypothetical person was restricted to light jobs. (*Id.*) The ALJ asked the VE if there were any jobs the hypothetical person could perform. (R. at 47.)

The VE opined that the hypothetical person could perform a photocopy machine operator (207.685-014, unskilled, SVP:2) with 165,000 jobs in the national economy, a price tagger (209.587-034, unskilled, light, SVP: 2) with 190,000 jobs in the national economy, and a sorter (521.687-086, unskilled, SVP: 2). (*Id.*) In response to a question by the ALJ, the VE testified that his testimony was consistent with the Dictionary of Occupational Titles (DOT) and the Selected Characteristics of Occupations (SCO). (R. at 48.)

Plaintiff's attorney asked the VE how many absences per month an employer would tolerate without terminating an employee. (*Id.*) The VE opined no more than two absences per month. (*Id.*) The VE was next asked to opine if an individual who had to take unscheduled work breaks

throughout the day would be able to maintain competitive employment.  (R. at 49.)  The VE opined

that such a person would not be able to maintain competitive employment.  (*Id.*)  Plaintiff's attorney

then asked the VE whether the jobs that he identified required a certain pace or quota in order to

fulfill an employer expectation.  (*Id.*)  The VE testified that a certain amount of work would need

to be done by the end of each work day.  (*Id.*)  The VE also testified that an employer would not

tolerate continuous redirection and reinstruction in the jobs he identified for the hypothetical person,

that an employee would typically have no more than a month to learn the job, and that it would

affect an employee's ability to maintain competitive employment if he required constant redirection

and reinstruction.  (R. at 49-50.)

## C.     ALJ's Findings

The ALJ issued his decision denying benefits on February 5, 2014.  (R. at 10-21.)  At step

one,[3] he found that Plaintiff had not been engaged in substantial gainful activity since January 20,

2012, the application date.  (R. at 12.)  At step two, he found that Plaintiff had the severe

impairments of traumatic brain injury and major depressive disorder.  (*Id.*)  At step three, the ALJ

found that Plaintiff did not have an impairment or combination of impairments that met or medically

equaled the severity of the impairments listed in the regulations.  (R. at 15.)

Before proceeding to step four, the ALJ determined that Plaintiff had the following Residual

Functional Capacity (RFC):

> The residual functional capacity produced by the medically determinable
> impairments permits the lifting of 20 pounds occasionally, and to frequently lift
> and/or carry up to 10 pounds, walk, sit and stand for 6 hours in an 8 hour work day
> as defined by regulations at 20 CFR §404.  The claimant has the ability to
> understand, carry out, and remember simple instructions; to respond appropriately

---

[3]  The references to steps refer to the five-step analysis used to determine whether a claimant is disabled under the Social
Security Act, which is described more specifically below.

to supervision, coworkers, and usual work situations; and, to deal with changes in a routine work setting. He must avoid jobs requiring teamwork, decision making, using judgment, or problem solving. He should have only occasional contact with members of the general public. His work must not require him to give or receive direction from such members. Furthermore, his work must not require individual initiative or work that requires him to be a self-started or closer. Generally, claimant is restricted to routine, solitary, repetitive work that does not require close oversight by a supervisor. He should avoid exposure to unguarded hazards, open nip points, unprotected heights, and moving machinery. Finally, he can have only occasionally exposure to cold, and heat extremes, wetness, humidity, fumes, odors, loud noises, hazardous machinery, vibration, and work at unprotected heights.

(R. at 15-16.) At step four, the ALJ found that Plaintiff could not perform his past relevant work.

(R. at 19.)

The ALJ continued to step five and found that transferability of job skills was not material to the determination of disability because use of the Medical-Vocational Rules as a framework supported a finding that Plaintiff was not disabled, whether or not he had transferrable job skills. (R. at 20.) Considering Plaintiff's age, education, work experience, and residual functional capacity, the ALJ found there were jobs in significant numbers in the national economy that he could perform. (*Id.*) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined under the Social Security Act, from January 20, 2012, the date the application was filed. (R. at 21.)

## II.   ANALYSIS

### A.   Legal Standards

#### 1.   *Standard of Review*

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. § 405(g). "Substantial evidence is that which is relevant and sufficient

for a reasonable mind to accept as adequate to support a conclusion; it must be more than a scintilla,

but it need not be a preponderance." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (quoting

*Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)).  In applying the substantial evidence

standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own

judgment, but rather, scrutinizes the record to determine whether substantial evidence is present.

*Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a

conspicuous absence of credible evidentiary choices or contrary medical findings to support the

Commissioner's decision.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program

is identical to that of a decision under the social security disability program.  *Davis v. Heckler*, 759

F.2d 432, 435 n. 1 (5th Cir. 1985).  Moreover, the relevant law and regulations governing the

determination of disability under a claim for disability insurance benefits are identical to those

governing the determination under a claim for supplemental security income.  *Id.* Thus, the Court

may rely on decisions in both areas without distinction in reviewing an ALJ's decision.  *Id.* at 436

and n.1.

### 2.   *Disability Determination*

To be entitled to social security benefits, a claimant must prove that he or she is disabled as

defined by the Social Security Act.  *Leggett*, 67 F.3d at 563-64.  The definition of disability under

the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in death or

which has lasted or can be expected to last for a continuous period of not less than 12 months."  42

U.S.C. § 423(d)(1)(A).  When a claimant's insured status has expired, the claimant "must not only

prove" disability, but that the disability existed "prior to the expiration of [his or] her insured status."

*Anthony*, 954 F.2d at 295.   An "impairment which had its onset or became disabling after the special

earnings test was last met cannot serve as the basis for a finding of disability."   *Owens v. Heckler*,

770 F.2d 1276, 1280 (5th Cir. 1985).

     The Commissioner utilizes a sequential five-step analysis to determine whether a claimant

is disabled:

1.    An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.    An individual who does not have a "severe impairment" will not be found to be disabled.

3.    An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.    If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.    If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)

(currently 20 C.F.R. § 404.1520(a)(4)(i)-(v) (2012)).   Under the first four steps of the analysis, the

burden lies with the claimant to prove disability.   *Leggett*, 67 F.3d at 564.   The analysis terminates

if the Commissioner determines at any point during the first four steps that the claimant is disabled

or is not disabled.   *Id.*   Once the claimant satisfies his or her burden under the first four steps, the

burden shifts to the Commissioner at step five to show that there is other gainful employment

available in the national economy that the claimant is capable of performing.   *Greenspan*, 38 F.3d

at 236.   This burden may be satisfied either by reference to the Medical-Vocational Guidelines of

the regulations or by expert vocational testimony or other similar evidence.  *Fraga v. Bowen*, 810

F.2d 1296, 1304 (5th Cir. 1987).  After the Commissioner fulfills this burden, the burden shifts back

to the claimant to show that he cannot perform the alternate work.  *Perez v. Barnhart*, 415 F.3d 457,

461 (5th Cir. 2005).  "A finding that a claimant is disabled or is not disabled at any point in the five-

step review is conclusive and terminates the analysis."  *Loveland v. Bowen*, 813 F.2d 55, 58 (5th Cir.

1987).

**B.**     **Issue for Review**

Plaintiff raises one issue for review:

The ALJ's finding that Plaintiff retains the ability to perform other work existing in significant numbers in the national economy is not supported by substantial evidence.

(doc. 25 at 1, 4.)

**C.**     **Significant Number of Jobs**

Plaintiff argues that the ALJ erred in finding that he retained the ability to perform work

existing in significant numbers in the national economy.  (doc. 25 at 4.)

At step five of the sequential review process, it is the Commissioner's burden to show that

a claimant is capable of performing other gainful employment in the national economy.  *Greenspan*,

38 F.3d at 236; 20 C.F.R. § 404.1520(a)(4)(i). According to the Code of Federal Regulations,

"[w]ork exists in the national economy when there is a significant number of jobs (in one or more

occupations) having requirements which you are able to meet with your physical or mental abilities

and vocational qualifications."  20 C.F.R. § 404.1566(b).  It is the Commissioner's burden at step

five to show that a claimant is capable of performing other gainful employment in the national

economy.  20 C.F.R. § 404.1520(a)(4)(i); *Greenspan*, 38 F.3d at 236.  Once the Commissioner finds

that jobs in the national economy are available to a claimant, the burden of proof shifts back to the

claimant to rebut this finding.  *See Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing

*Fraga*, 810 F.2d at 1302).

To establish that work exists for a claimant in significant numbers, an ALJ relies on the

testimony of a VE in response to hypothetical questions[4] or other similar evidence, or on the

Medical-Vocational Guidelines promulgated to guide this determination, often referred to as "the

Grids."[5]  *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000); *Bowling v. Shalala*, 36 F.3d 431, 435

(5th Cir. 1994); 20 C.F.R. Pt. 404, Subpt. P, App. 2 (2008).  An ALJ may rely exclusively on the

Grids if the impairments are solely exertional,[6] or if the nonexertional impairments do not

sufficiently or significantly[7] affect the RFC.  *Newton*, 209 F.3d at 458 (citing *Fraga*, 810 F.2d at

1304 (stating that when "the claimant either suffers only from exertional impairments or his

non-exertional impairments do not significantly affect his residual functional capacity, the ALJ may

---

[4]  "The ALJ relies on VE testimony in response to a hypothetical question because the VE 'is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed.'" *Benton ex rel. Benton v. Astrue*, 3:12-CV-874-D, 2012 WL 5451819, at *7 (N.D. Tex. Nov. 8, 2012) (quoting *Carey v. Apfel*, 230 F.3d 131, 145 (5th Cir. 2000)).

[5]  The Grids are divided into age categories, and the determination of whether an individual is presumptively disabled differs depending upon the age category and other factors. See 20 C.F.R. Pt. 404, Subpt. P, App. 2.

[6]  Under the Social Security regulations, impairments are either exertional or nonexertional. Impairments are classified as exertional if they affect the claimant's ability to meet the strength demands of jobs.  The classification of a limitation as exertional is related to the United States Department of Labor's classification of jobs by various exertion levels (sedentary, light, medium, heavy, very heavy) in terms of the strength demands for sitting, standing, walking, lifting, carrying, pushing, and pulling. All other impairments are classified as nonexertional.  *See Holiday v. Barnhart*, 460 F. Supp. 2d 790, 806 (S.D. Tex.2006) (citing *Sykes v. Apfel*, 228 F.3d 259, 263 (3d Cir. 2000) and 20 C.F.R. § 404.1569(a)); *see also* Social Security Ruling (SSR) 96–9P (1996), 1996 WL 374185, at *5 ("[A] nonexertional limitation is an impairment-caused limitation affecting such capacities as mental abilities, vision, hearing, speech, climbing, balancing, stooping, kneeling, crouching, crawling, reaching, handling, fingering, and feeling. Environmental restrictions are also considered to be nonexertional." (emphasis original)).

[7]  *Compare Newton*, 209 F.3d at 458 (the nonexertional impairments "do not *sufficiently*" affect the RFC) (emphasis added), *with Selders*, 914 F.2d at 619 (the nonexertional impairments "do not *significantly*" affect the RFC) (emphasis added); *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir.1987) (same).

rely exclusively on the Guidelines in determine whether there is other work available that the claimant can perform.")).  If the claimant suffers from nonexertional impairments, or a combination of exertional and nonexertional impairments, then the ALJ must rely on the testimony of a VE or other similar evidence to establish that such jobs exist in the economy.  *Id.*

Here, the ALJ found at step two that Plaintiff had severe traumatic brain injury and major depressive disorder.  (R. at 12.)  Because he found that these severe impairments or combination of impairments did not meet or equal a listed impairment, the ALJ proceeded to determine Plaintiff's RFC.  (R. at 15.)  At step five, the ALJ found that although Plaintiff was unable to perform his past relevant work, he was not disabled because he was able to perform other jobs of sufficient number in the national economy, i.e., Photo Copy Machine Operator (207.685-014, light/unskilled, SVP 2), Price Tagger (209.587-034, light/unskilled, SVP 2), and Sorter (521.687-086, sedentary/unskilled, SVP 2).  (R. at 20.)

Plaintiff contends that the RFC upon which the ALJ relied in making his step-five determination "contains inconsistences."  (doc. 25 at 4-5.)  Specifically, the RFC included that he "must avoid jobs requiring teamwork, decision making, using judgment, or problem solving," yet "all work requires *some* level of judgment, decision making or problem solving."[8]  (*Id.* at 5) (emphasis in original) (citing R. at 16).  The Commissioner does not dispute that the RFC is inconsistent with the ALJ's step-five determination or that all jobs require some level of judgment, decision making, or problem solving.  (doc. 26 at 5-6.)

---

[8]  Plaintiff also points to language in the RFC that stated "his work must not require individual initiative or work that requires him to be a self-started or closer" and he was "restricted to routine, solitary, repetitive work that does not require close oversight by a supervisor."  (doc. 25 at 4-5) (citing R. at 16.)  Plaintiff's argument regarding judgment, decision making, and problem solving does not conflict with that language he identified, however.  Accordingly, that language is found not to be inconsistent.

D.      **Scrivener's Error**

The Commissioner argues that any inconsistency at step five was the result of "an inadvertent misstatement or scrivener's error" by the ALJ in deciding the RFC.  (*Id.*)

"In the context of social security cases, errors in ALJ decisions have been excused as mere scrivener's errors when the *ALJ's intent was apparent*."  *Dukes v. Colvin*, No. 3:14–CV–173–BF, 2015 WL 1442988, at *4 (N.D. Tex. Mar. 31, 2015) (emphasis added) (citing *Douglas v. Astrue*, No. 1:09–1349–CMC–SVH, 2010 WL 3522298, at *3-5 (D.S.C. Sept. 3, 2010) (citing and discussing cases)).  In *Dukes*, the Commissioner's argument that the omission of the word "overhead" in describing the plaintiff's reaching restrictions was found not to be a mere scrivener's error because "it [was] just as likely that the ALJ inadvertently included the overhead limitation in his hypothetical as omitted it from Plaintiff's RFC."  *Id.* at *4.  A scrivener's error was found by a reviewing court, however, where a single mention by an ALJ that a claimant was capable of performing only light work was inconsistent with multiple specific findings later in the ALJ's decision that the claimant was capable of medium-level work and that she could return to her past relevant work that was categorized as medium-level work.  *Willis v. Colvin*, No. 1:14-CV-504, 2016 WL 792693, at *6 (E.D. Tex. Mar. 1, 2016).

Here, the ALJ determined:

The residual functional capacity produced by the medically determinable impairments permits the lifting of 20 pounds occasionally, and to frequently lift and/or carry up to 10 pounds, walk, sit and stand for 6 hours in an 8 hour work day as defined by regulations at 20 CFR §404.  The claimant has the ability to understand, carry out, and remember simple instructions; to respond appropriately to supervision, coworkers, and usual work situations; and, to deal with changes in a routine work setting.  *He must avoid jobs requiring teamwork, decision making, using judgment, or problem solving.*  He should have only occasional contact with members of the general public.  His work must not require him to give or receive direction from such members.  Furthermore, his work must not require individual

initiative or work that requires him to be a self-started or closer.  Generally, claimant is restricted to routine, solitary, repetitive work that does not require close oversight by a supervisor.  He should avoid exposure to unguarded hazards, open nip points, unprotected heights, and moving machinery.  Finally, he can have only occasionally exposure to cold, and heat extremes, wetness, humidity, fumes, odors, loud noises, hazardous machinery, vibration, and work at unprotected heights.

(R. at 15-16) (emphasis added).  Based upon the VE's testimony, the ALJ found that Plaintiff was not disabled because he was able to perform other jobs of sufficient number in the national economy, i.e., Photo Copy Machine Operator, Price Tagger, and Sorter.  (R. at 20.)  As noted, the Commissioner does not contest that these jobs are insistent with Plaintiff's RFC.  (doc. 26 at 5.)

### 1.   *All jobs require some ability*

The Commissioner first argues that all jobs require some ability to make decisions, use judgment, and solve problems.  (*Id*. at 5-6.)  She also contends that "[i]f the ALJ had believed that Plaintiff had no such ability, then he would not have found that Plaintiff could successfully adjust to work that exists in significant numbers in the national economy. . . . [or that] he would not have questioned whether Plaintiff stopped working for non-medical reasons, as he did" in the decision. (*Id*. at 6.)  Plaintiff did not reply to this argument.

The Commissioner does not provide authority for her position, and instead appears to rely on the ALJ's apparently inconsistent statement in the decision and the inconsistency of the RFC itself.  (*See id.*)  Although she argues that the ALJ would not have questioned Plaintiff's non-medical reasons for having stopped working or made specific findings had he meant to include the restriction, the opposite is also possible.  *See, e.g., Dukes*, 2015 WL 1442988, at *4 (rejecting the Commissioner's argument that an omission was a scrivener's error because "it [was] just as likely that the ALJ inadvertently included the overhead limitation in his hypothetical as omitted it from Plaintiff's RFC.").  Accordingly, the Commissioner's first argument fails.

### 2.      Hypothetical questions

The Commissioner next argues that the ALJ's hypothetical questions to the VE reflect that the ALJ intended to determine Plaintiff could make judgments that were commensurate with the functions of an unskilled worker, simple work-related decisions, and perform routine, solitary, repetitive work that did not require close oversight by a supervisor.[9]  (doc. 26 at 6.)   The Commissioner notes that the ALJ presented hypothetical questions to the VE that were consistent with the alleged intent and that the VE identified a significant number of jobs that Plaintiff could perform in the national economy.  (*Id.* at 8.)  She further argues, "Given that the ALJ articulated hypothetical questions that reasonably incorporated the restrictions that he recognized, and that Plaintiff received the opportunity for cross-examination, the ALJ properly relied on the [VE's] testimony to deny Plaintiff's claim at step five."  (*Id.*)

The Commissioner does not point to any specific hypothetical questions asked to the VE or identify a specific part of the VE's testimony that clearly shows the ALJ's intended RFC differed from what the ALJ actually identified in his decision, however.  (*See id.*)  Accordingly, the Commissioner's second argument also fails to support the finding of a scrivener's error.

### 3.      Medical evidence

The Commissioner further argues that Plaintiff has not met his burden of proving disability by providing competent medical evidence of his allegedly disabling conditions.  (doc. 26 at 7.)

As noted, under the first four steps of the sequential five-step analysis, the burden lies with the claimant to prove disability.  *Leggett*, 67 F.3d at 564.  While the burden is on the claimant, the

---

[9]  As part of this argument, the Commissioner's brief also considered the medical evidence of Drs. Carr and Geary.  (*See* doc. 26 at 6-7.)  Because the Commissioner's next argument directly addresses medical evidence, the medical evidence of Drs. Carr and Geary's will be considered in that section.

ALJ determines the claimant's RFC, which is "based on all of the relevant medical and other evidence," including opinions submitted by treating physicians and other acceptable medical sources, and should account for all of the claimant's "medically determinable impairments . . . including [those] that are not 'severe.'" *See* 20 C.F.R. § 404.1545(a)(3) (2012); SSR 96-8p, 1996 WL 374184, at *1. The ALJ "is responsible for assessing the medical evidence and determining the claimant's residual functional capacity." *Perez v. Heckler*, 777 F.2d 298, 302 (5th Cir. 1985). A reviewing court must defer to the ALJ's decision when substantial evidence supports it, even if the court would reach a different conclusion based on the evidence in the record. *Leggett*, 67 F.3d at 564.

Here, the Commissioner argues that "Plaintiff has not shouldered his *burden of proving* that he had disabling mental limitations." (doc. 26 at 7) (emphasis added). In support, she relies on the medical evidence of Drs. Carr, Geary, Ludden, and Morgan. (doc. 26 at 7.) The Commissioner does not point to anything in the decision that clearly shows that the ALJ's intent in determining the RFC was different from what was written in the decision, however. (*See id.*) The Commissioner's appears to ask a reviewing court to reweigh the medical evidence in the record to find an intent that was consistent with the ALJ's decision at step five. A reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment; it scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. Because the Commissioner has not identified anything in the decision showing that the ALJ clearly intended a different RFC, the Commissioner's third argument fails.

In conclusion, the Court finds that any inconsistency at step five was not the result of an inadvertent misstatement or scrivener's error by the ALJ in deciding the RFC. As noted, it is the

Commissioner's burden at step five to show that a claimant is capable of performing other gainful employment in the national economy. 20 C.F.R. § 404.1520(a)(4)(i); *Greenspan*, 38 F.3d at 236. The Commissioner does not dispute that the RFC is inconsistent with the ALJ's step-five determination. (doc. 26 at 5.) Accordingly, there is a lack of substantial evidence to support the ALJ's step-five finding that Plaintiff could perform work existing in significant numbers. *Greenspan*, 38 F.3d at 236.

**E.     Harmless Error**

An ALJ's error is harmless if the substantial rights of a party have not been affected. *See Alexander*, 412 F. App'x at 722. Here, the ALJ found that although Plaintiff was unable to perform his past relevant work, he was not disabled because he was able to perform other jobs of sufficient number in the national economy for Plaintiff's RFC, i.e., Photo Copy Machine Operator (207.685-014, light/unskilled, SVP 2), Price Tagger (209.587-034, light/unskilled, SVP 2), and Sorter (521.687-086, sedentary/unskilled, SVP 2). (R. at 20.) As discussed, there was a lack of substantial evidence for this determination, and it ultimately resulted in the finding that Plaintiff was not disabled and should not receive disability benefits. The ALJ's decision that Plaintiff could perform other jobs existing in significant numbers in the national economy therefore affected Plaintiff's substantial rights. The error is not harmless, and remand is warranted.

**III. CONCLUSION**

The Commissioner's decision is **REVERSED**, and the case is **REMANDED** for further administrative proceedings.

**SO ORDERED** on this 19th day of September, 2016.


IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE